## DISSOLUTION OF CORPORATION UPON PETITION OF MINORITY STOCKHOLDERS.

Common Pleas Court of Hamilton County.

SAMUEL OPPENHEIMER, ET AL V. OPPENHEIMER PRINTING CO. ETC.

Decided June 7, 1923.

*Corporations—Minority Stockholders may Petition for Dissolution, When—Proceeding Statutory—What Minority must Show to Secure Decree of Dissolution.*

1. Courts of equity are without jurisdiction to decree dissolution of a corporation and distribution of its assets; such an action, brought by minority stockholders, is a purely statutory proceeding.

2. In an action wherein minority stockholders owning more than one-third of the capital stock of a corporation petition for its dissolution, the issue to be determined is whether or not the interest of the stockholders as stockholders can be best promoted by granting a dissolution, or by continuing the business as it is so long as existing conditions continue, the burden being upon the proponents, and consideration being eliminated of any benefit which might come to them from being made employees and paid a salary.

*J. L. Kohl,* for the plaintiff.

*Jones & Jones,* for the defendant.

MATTHEWS, J.

This is an action by the minority stockholders owning more than one-third of the capital stock of the Oppenheimer Printing Company, praying for the dissolution of the corporation. It is a statutory proceeding. Courts of equity early held that they had no jurisdiction to decree a dissolution of a corporation and distribute its assets. The non-statutory rule is stated in 7 R.C.L. 315, as follows:

"Where the corporation is a going concern, it is undoubtedly true that a minority stockholder can not maintain a bill to have it dissolved or to have its assets distributed. In such case, if the shareholders disapprove of the company's management or consider their speculation a bad one, their remedy is to elect new officers or to sell their shares and withdraw."

The rule has been somewhat relaxed in modern times, and courts of equity have under certain circumstances upon the petition of minority stockholders decreed a winding up and distribution of the corporate assets. These cases, however, invariably have in their facts the elements of fraud and breach of trust, in addition to insolvency, or imminent insolvency, and these courts while decreeing a winding up uniformly reiterate the general rule that minority stockholders in a going, solvent concern, can not maintain an action for a dissolution.

*Kahan* v. *Alaska June Co.*, 10 A. L. R., 151; *Thwing* v. *McDonald,* Anno. Cases, 1918 E, p. 420, and note at 424; *Central Land Co.* v. *Sullivan,* 15 Anno. Cases, 420 at 422; 8 Fletcher on Corporations, p. 9157; 14A Corpus Juris, pp. 1123 and 1124; Thompson on Corporations, 1922 Sup. Sec. 6502.

The remedy, therefore, of minority stockholders in an Ohio corporation must be regarded as exclusively statutory; and this petition was formulated in the light of the Ohio statutes on the subject which are Sections 11938 to 11978, both inclusive, General Code.

By Section 11938 it is provided:

"When a majority of the directors, trustees, or other officers having the management of the concerns of a corporation, or stockholders representing not less than one-third of the capital stock of the corporation, organized under the laws of this state, * * * deem it beneficial to the interests of the stockholders that the corporation be dissolved; * * * they may apply by petition to the common pleas court of this county * * * for its dissolution pursuant to the provisions of this chapter."

By Section 11941 the court is required to appoint a referee or master commissioner before whom interested persons may appear to show cause why the corporation should not be dissolved.

Any by Section 11943 it is enacted that:

"When the report is made, if it appears to the court that the corporation is insolvent, or that its dissolution will be beneficial to the stockholders, * * * a judgment shall be entered dissolving the corporation."

In this case in obedience to the statute, a master commissioner was appointed, before whom testimony was taken which he has reported to the court. From this testimony it appears that Samuel Oppenheimer and Louis K. Oppenheimer were partners in the printing business prior to 1904, at which time this corporation was formed and took over the partnership business, and the partners received an equal share of the corporate stock.

At that time one, Herman Simon, subscribed for 38 shares of the capital stock, and it is now determined by decree in another case that he is the owner of said stock, and that it has been fully paid for. Other stock, small allotments just sufficient to comply with the law in organizing the corporation, have been in the hands of other persons from the time of the organization of the corporation to the present time. During all that time, however, Samuel Oppenheimer and Louis K. Oppenheimer were the two largest stockholders and owned substantially the same amount of stock, and either by the co-operation of Herman Simon could control the election of the majority of the board of directors.

Until a few years ago both Oppenheimers occupied official positions in the corporation and drew salaries in the same amount. A few years ago, however, differences developed which eventually resulted in Samuel Oppenheimer being dropped from the payroll of the corporation and supplanted as an officer therein by stockholders friendly to L. K. Oppenheimer. This was done by the vote of the majority of the stockholders, consisting of L. K. Oppenheimer, Herman Simon, A. L. Duwelius and Robern Onken.

While Samuel Oppenheimer and Louis K. Oppenheimer were drawing salaries of the same amount, and because of the condition of the business, no dividends were declared excepting a dividend of one and one-half percent in 1920. Since Samuel Oppenheimer has ceased to be an officer and employee of the corporation, quarterly dividends have been declared of two per cent. and there is now a rather large surplus of cash in bank, and an investment in Liberty Bonds and War Stamps out of the savings totaling in the neighborhood of $15,000, in addition to the tangi-

ble assets, accounts receivable and good will, and the liabilities of the company amount to very little.  The evidence shows that the corporation is being operated at a profit.

Shortly after Samuel Oppenheimer ceased to be employed by the corporation, the regulations of the corporation were amended at a stockholders meeting, so as to provide among other things for the employment of a general manager at a salary of $2,500 a year, with the provision for additional compensation of $625 quarterly, contingent upon the prosperity of the business.

Counsel for the plaintiffs has criticised the phraseology of these regulations, claiming that the contingent compensation, under the strict meaning of the language used, would be payable out of any surplus on hand, no matter when earned. As the regulations originally stood and as subsequently amended, it was payable if sufficient surplus had been earned during the next preceeding twelve months in excess of a sum equal to one and one-half per cent of the par value of the capital stock; and it was urged that this action of the directors shows that they contemplated the payment of a salary of $5,000 to the general manager before any real provision for the payment of any dividend was made. As a matter of fact, however no attempt to pay the additional salary before making provision for a six per cent dividend has been made, and such purpose was expressly disclaimed at the trial.

The general manager employed was L. K. Oppenheimer, and plaintiffs claim that all this action with reference to amending the by-laws was for the purpose of diverting the earnings of the corporation to L. K. Oppenheimer individually, so as to deprive Samuel Oppenheimer of any financial enjoyment of his stock ownership, and that the accumulation of the surplus and refusal to distribute it in dividends was in pursuance of the same intent.

On the other hand, the defendants contend that the pay roll has not been increased at all; that L. K. Oppenheimer has been doing the work formerly done by both himself and Samuel Oppenheimer, and that the salary arrangement is a just one, and that the retention of the surplus profits after paying a dividend

of six or eight per cent per annum, is in conformity to sound and conservative business management.

The burden of proof in this case is upon the plaintiff. In the opinion of the court there is not a preponderance of the evidence that there was any fraudulent conduct on the part of L. K. Oppenheimer and those co-operating with him. It is true there was joint action on their part, but as stockholders they had a right to join together for the purpose of constituting a majority and thereby controlling the destiny of the corporate business. The preponderance of the evidence does not show that any illegal conspiracy existed for the purpose of injuring Samuel Oppenheimer in the ownership of his corporate stock.

The record, in the opinion of the court, presents a case of a solvent corporation doing business at a profit with every prospect of a continuance of said conditions; and that the management of said corporation is apparently competent, because it has been operating at a profit under that management.

The question presented to the court is whether or not it would be justified in entering a decree of dissolution of such corporation under the provisions of Section 11943, General Code. To resolve that question it must be determined what the Legislature meant by the expression "will be beneficial to the stockholders," for the court must find in this cause that the dissolution and winding up would be beneficial to the stockholders before it would be justified in entering a decree.

In construing this language the court concludes that the Legislature assumed that all stockholders would look at the problem strictly from the viewpoint of the greatest financial return to them as stockholders; this, therefore, eliminates the benefit that might accrue to the majority stockholders in the way of salaries as employees on the one hand, and also eliminates from consideration the possibility that the minority stockholders desire to withdraw their investment for the purpose of investing it in other enterprises that they think might result more profitably to them; and it also eliminates all consideration of personal animus.

Laying aside, therefore, these considerations it seems to the

court that under the language used in the statute the question presented is whether or not it will be to the greater financial interest of stockholders as stockholders to wind up this business now rather than to continue it so long as existing conditions remain. The existing conditions are that the corporation is entirely solvent and is earning a large profit on its outstanding capital stock. While only six or eight per cent. dividends have been declared, the surplus remains and goes to augment the value of the outstanding stock, and if at any time this surplus is held and not distributed as dividends, and this retention of the surplus is in bad faith, ample remedy is provided the minority stockholders to compel its distribution in the form of dividends.

To wind this corporation up now would have the effect of stopping a profitable business. The good will would necessarily be lost or largely sacrificed, and the assets disposed of at judicial sale, through which it would be impossible to realize their full value.

Under these circumstances would any stockholder basing his judgment solely on the condition of the corporation and its reasonable prospects conclude that it should be dissolved now? It seems to the court that no stockholder would so conclude and that therefore the court would not be justified in disturbing the *status quo;* that looking at the question purely from the standpoint of the value of the stock itself, and the possibility of monetary return to the stockholders dissolution would not suggest itself as even a reasonable alternative to continuance because it would result in the destruction of a large part of the present value of the stock.

In passing the court wishes to comment upon just one case. Counsel for the plaintiff relies strongly upon the case of the *Mansfield Ry. Light & Power Co.,* 21 C. C. (N.S.), 95, as supporting the power of the court to order a dissolution under the circumstances of this case. In that case, however, it appears that a majority of the stock of the Mansfield Ry. Light & Power Company was owned by the Cleveland & Southwestern Company, and that in the conduct of the business of those two companies

there was a constant and ever recurring conflict of interest; the majority of the stockholders and directors were in the ordinary routine of the business of the two corporations called upon continuously to decide between the interest of the Mansfield Ry. Light & Power Co. and the interest of the Cleveland & Southwestern Co.; the majority was attempting to serve two masters, to serve one it was necessary to sacrifice the other, and inasmuch as the greater interest was in the Cleveland & Southwestern Co. the court drew the inference that it was natural that these directors should bestow their loyalty where their greater interest was.

In the case at bar the interest of all these stockholders as stockholders is the same; the only conflict of interest exists when the question of fixing salaries is before the governing body; when that one question is decided it is equally to the interest of the majority as to that of the minority that the business be conducted at the largest possible profit. In the event of an attempt to divert profits under the guise of excessive salaries, the minority has an ample remedy by way of injunction, recourse to which would preserve the stock value, whereas the awarding of the relief prayed for in this action would have the tendency to in part destroy the value of the stock.

The court is of the opinion that the plaintiffs have failed to show that a dissolution of this corporation would be beneficial to the stockholders, and therefore the prayer of the petition is denied.